# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

| | |
|---|---|
| **JAMES E. MASON, JR.** | **CIVIL ACTION NO. 5:16-cv-570** |
| **LA. DOC #589589** | |
| | **SECTION P** |
| **VS.** | |
| | **JUDGE ELIZABETH E. FOOTE** |
| **DARREL VANNOY** | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

*Pro se* Petitioner James E. Mason, Jr., an inmate in the custody of the Louisiana State Penitentiary in Angola, Louisiana, filed the instant Petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on April 25, 2016. [doc. # 1]. Petitioner attacks his September 1, 2011, conviction for Second Degree Murder and his sentence of life imprisonment without the benefit of parole, probation or suspension of sentence imposed thereon by Louisiana's First Judicial District Court, Caddo Parish. This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the Court.

## Background

On September 1, 2011, Petitioner James E. Mason, Jr., was convicted of second degree murder in the drive-by shooting of a 16-year-old girl, and sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence. Mason's co-defendant, Charles Evans, fired shots from the passenger side of an SUV that Mason was driving, killing the victim and wounding a teenage boy.

1

On August 27, 2012, Petitioner appealed his conviction to the Second Circuit Court of Appeal. [doc. #1-3, p. 64]. He raised four claims for relief: (1) insufficiency of evidence; (2) he was denied his right to confrontation when his co-defendant's written statements were used as substantive evidence; (3) the jury was permitted to render a verdict without requiring the State to meet its burden of proof on the requisite intent; and (4) the trial court erred in denying Petitioner's *Batson* challenges where it did not require the State to provide race-neutral reasons for its peremptory challenges of prospective black jurors. [doc. #1-3, pp. 20-38].

On January 16, 2013, the Second Circuit Court of Appeal affirmed defendant's conviction and sentence. *State v. Mason*, 109 So.3d 429 (La. Ct. App. 2d Cir. 2013). The appellate court found that there was sufficient evidence to convict Petitioner of second degree murder, and that his co-defendant's statements were admissible at trial to attack his credibility. The appellate court further found that Petitioner never timely objected to any of the proposed jury instructions and therefore, he could not raise that issue on appeal. Lastly, the court found that Petitioner failed to present a prima facie case of racial discrimination in the State's use of its peremptory challenges.

On February 5, 2013, Petitioner filed an application for writ of certiorari to the Louisiana Supreme Court, raising the same four issues. *Id.* at 7-17.  His application was denied on July 31, 2013. *Id.* at 6.

On June 5, 2014, Petitioner filed a *pro se* application for post-conviction relief in the First Judicial District Court raising three ineffective assistance of counsel claims for: 1) trial counsel's failure to object to the State's playing of the entirety of Charles Evans' statements to police; 2) trial and appellate counsel's failure to raise the issue of impeached testimony being impermissibly used to convict the Petitioner; and 3) trial counsel's failure to object to certain

jury instructions and the State's improper closing argument, and appellate counsel's failure to raise ineffective assistance of counsel on appeal. [doc. #1-4, p. 62].

On August 6, 2014, the trial court denied post-conviction relief, finding that Mason failed to meet his burden under *Strickland v. Washington*, 466 U.S. 668 (1984). [doc. #1-5, p. 12-13].

On September 2, 2014, Petitioner filed an application for supervisory writ of review with the Second Circuit Court of Appeal, raising the same three ineffective assistance claims. *Id.* at 19-44. On December 10, 2014, the appellate court denied writ "[u]pon the showing made". *Id.* at 47.

On January 7, 2015, Petitioner filed a writ application with the Louisiana Supreme Court, again raising the same three ineffective assistance claims. *Id.* at 49-67. The Louisiana Supreme Court denied writ on November 6, 2015, holding that Mason "failed to show he received ineffective assistance of counsel". *Id.* at 71.

Petitioner timely filed the instant petition on April 25, 2016, asserting seven grounds for relief from his September 2011 conviction: (1) insufficiency of evidence; (2) Petitioner was denied his right to confrontation at trial; (3) the jury was permitted to render a verdict against Petitioner without requiring the State to meet its burden of proof on the requisite intent; (4) the trial court erred in denying Petitioner's *Batson* challenges without requiring the State to provide race-neutral reasons for its peremptory challenges of prospective black jurors; (5) trial counsel was ineffective for failing to object when the State read at trial the entirety of Charles Evans' statement to the police; (6) trial and appellate counsel were ineffective for failing to raise the issue of impeached testimony being impermissibly used to convict the Petitioner; and (7) trial counsel was ineffective for failing to object to jury instructions and improper closing arguments at trial, and appellate counsel was ineffective for failing to raise ineffective assistance of trial

counsel on appeal. [doc. #1].

The matter is now before the Court.

## Law and Analysis

### I.    Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief. The AEDPA limits how a federal court may consider *habeas* claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 740. Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the

prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts. Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). AEDPA has put into place a deferential standard of review, and a federal court must defer to a state court adjudication on the merits. *Valdez v. Cockrell*, 274 F.3d 941, 950 (5th Cir. 2001). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## II.    Petitioner's Claims

1.    <u>Insufficient Evidence</u>

Petitioner argues that there was insufficient evidence to convict him of principal to second degree murder in the drive-by shooting of Latora Wiley. [doc. #1-2, p. 13]. It is undisputed that Charles Evans shot and killed Ms. Wiley from the passenger seat of Petitioner's car while Petitioner was driving. *Id.* Petitioner contends that there was no proof that he had the requisite mental state to be convicted of second degree murder.

When a *habeas* petitioner asserts that the evidence presented to the court was insufficient to support his conviction, the limited question is whether the state court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law as set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002). A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

In Louisiana, assault by drive-by shooting is defined as "an assault committed with a firearm when an offender uses a motor vehicle to facilitate the assault" "with the intent either to kill, cause harm to, or frighten another person." LA. R.S. § 14:37.1(A), (C). Second degree murder is defined as the killing of a human being:

> (1) When the offender has a specific intent to kill or to inflict great bodily harm; or

> (2)(a) When the offender is engaged in the perpetration or attempted perpetration of . . . assault by drive-by shooting . . . even though he has no intent to kill or to inflict great bodily harm.

*Id.* § 14:39.1(A)(1)-(2)(a). Second degree murder carries a mandatory sentence of life imprisonment at hard labor without benefits. *Id.* § 14:39.1(B). Additionally, "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals" under Louisiana law. *Id.* § 14:24. "[A]n individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state." *State v. Meyers*, 683 So.2d 1378, 1382 (La. Ct. App. 5th Cir. 1996) (citing *State v. Brooks*, 505 So.2d 714 (La. 1987)).

Here, the Louisiana appellate court invoked and applied the *Jackson* standard, and it did not do so unreasonably. *See Mason*, 109 So.3d at 433. The appellate court referenced the

definitions of second degree murder, assault by drive-by shooting, and principals. *Id.* It stated that a "defendant who is a principal in a drive-by shooting can be convicted of second degree murder even though the fatal shot was fired by a companion acting in concert with the defendant in the commission of the shooting." *Id.*

The appellate court then set forth the testimony and evidence presented at trial as follows:

The state presented the testimony of four of the teenagers who witnessed the shooting. They included the sister and stepsister of the victim and Terrance Washington, the young man who was wounded. While there were numerous discrepancies between their various accounts of the shooting, they all generally agreed that the defendant's vehicle almost struck members of their group who were walking in the street. Several indicated that the vehicle "swerved" at or "veered" toward them. When the teens reacted by yelling at the vehicle as it passed, it stopped and backed up. The witnesses agreed that words were exchanged between the vehicle occupants and the teenagers, after which the vehicle drove off. There was disagreement among the witnesses as to who spoke to the occupants, what was said, and the manner in which the words were spoken. In their testimony, only one of the teen witnesses admitted that profanity was used. However, the detective who took their statements shortly after the shooting said most of the kids indicated that there was profanity. Although Terrance stated in his testimony that he did not argue with the SUV passenger and that he did not recall telling the police that he exchanged profanities with the SUV passenger, the detective who took his statement at the hospital testified that Terrance told him that he had gotten into an argument with the SUV passenger. Also, two of the other teen witnesses testified that Terrance yelled at the SUV occupants about almost hitting them.

All of the teen witnesses agreed that their group stayed at the park for about 10 minutes. They then began walking down Ledbetter Street again. The white Equinox returned, came to a complete stop, and the passenger began to shoot. Three of the four teen witnesses testified that there were four to five shots fired. The vehicle then "crept off" slowly. It did not speed off, but drove away "like nothing ever happened."

The state also introduced the two statements the defendant made to the police, as well as his grand jury testimony. In his first statement, which was given the night of the shooting, the defendant recounted picking up his nephew at about 4:30 p.m. They came upon kids in the street screaming and yelling. He said that his nephew was almost hit by a young man and that he backed up to talk to the young man, who was saying to Evans "you got a gun, you want to use it, go ahead on." According to the first portion of the defendant's statement, someone shot at them as they were leaving and Evans fired back. The defendant said he did not know where Evans got the gun because he had taken it from him the day before. The defendant said that he

screamed and yelled at Evans afterwards, but that he did not know anyone had been shot.

In the same statement, the defendant then indicated that there were actually two confrontations. After the first one, he took Evans home. However, he decided that they needed to go back to talk to the guys. When he drove up, the young people began walking toward the vehicle. He was letting his window down when shots were fired and then Evans fired. He said he shook Evans after he fired the shots and that he was upset. He took Evans home. As to the gun, he said he had taken it away from Evans due to his temper. However, when he picked him up from work that day, he told Evans, "your gun is right here ... just go on and take it."

In his second statement which was given on November 30, 2007, the defendant said that he gave Evans the gun at the store they went to after the initial confrontation. The defendant again said he was the one who wanted to go back to "get it straight with these guys." As they were leaving the store, he told Evans his gun was right there and to take it because the defendant's wife did not want it in the car. He told Evans they were going to go straight to Evans' house because he feared retaliation. However, when they turned around to go back, there were guys on his side of the vehicle. When he went to roll down his window to talk to them, he heard shots and "took off." The defendant said he drove off because he panicked and he didn't know who was shooting. He did not recall saying anything to Evans after the shooting.

In this second statement, the defendant stated that he wanted Evans to "be a man, to go back and take care of the situation." By that, he said he meant to be man enough to apologize. He wanted to go back to apologize himself so Evans would be man enough to apologize. He insisted that they did not go back with the intention to "do anything" and that he gave the gun back to Evans to put it up. He also stated that he never thought Evans would do what he did. He maintained that he did not tell Evans to use the gun and that he wanted to show Evans how to resolve conflict without violence.

In his grand jury testimony, the defendant gave a more detailed account of the events. He stated that since Evans did not have a driver's license, he would give him a ride home from his job at the airport. He testified that on the day of the offense, he picked up Evans and was driving him home when they came upon a big crowd of kids in the street. The defendant estimated that the group consisted of approximately 20 to 25 teens between the ages of 14 to 18. He had to stop because they would not move. He put his window down. One young man was "acting up," jumping up and down, flashing what he believed were gang signs. The young man accused the defendant of almost hitting his cousin. Evans lowered his window to talk to the cousin. The young man on the defendant's side of the car looked at Evans and said, "Hey, man, if you have a gun, use it." Evans told the young man, "Ya'll were in the middle of the street." The young man called Evans "a little bitch ass n----r."

8

According to the defendant's grand jury testimony, the road cleared and he drove off. He took Evans to get cigarettes at a corner store. He decided that they should go back and apologize because he feared some sort of retaliation against Evans, who lived in the area. When he drove up to the group, he was rolling to a stop when he heard two shots coming from his right. He did not completely stop. After the shooting, he drove Evans home but did not say anything to him other than that they would talk later. When Evans called him from the police station that night and a detective asked him to come in, the defendant did not drive the SUV used in the shooting to the station.

In his grand jury testimony, the defendant said he took the gun from Evans the day before the shooting due to the young man's "bad temper." Evans told him that the gun was jamming; the defendant said later in his testimony that he was going to have the gun looked at but decided he needed to get the gun out of the vehicle before his wife saw it. The defendant testified that he told Evans to put the gun in the car console. He denied telling Evans to get his gun and put it up because his wife wanted it out of the car or saying that he wanted Evans to take his own responsibility. He testified that he did not discuss the gun with Evans, much less give it back. He then said that they did discuss the gun at the airport when he picked Evans up and that this was the only discussion they had about the gun. The defendant testified that he told Evans the gun was still in the console and to make sure he got it before he got out of the vehicle. According to the defendant, Evans knew where the gun was because it was still where Evans placed it the day before. He conceded that he did not call the police after the shooting; he said his cell phone was dead. However, he further admitted that he did not call 911 when he got home.

While Evans invoked his Fifth Amendment rights and declined to testify at the defendant's trial, the defense introduced a January 2008 letter written by Evans in which he stated that his uncle did not know he was going to shoot because he did not know himself that he was going to fire the gun. However, the state then presented as impeachment evidence the two statements Evans gave to the police in which he indicated that the defendant gave him the gun or access to it.

*Mason*, 109 So.3d at 434-37. Applying the *Jackson* standard, the appellate court held that the evidence in the case was sufficient to support Petitioner's principal to second degree murder conviction. *Id.* The court reasoned:

After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty of second degree murder. In order to convict him of second degree murder, the jury had to conclude that the defendant acted as a principal to Evans either when he acted with the specific intent to kill or inflict great bodily harm, or when Evans committed a drive-by shooting.

The teen witnesses to the shooting gave generally consistent accounts of the shooting

9

wherein there was an initial confrontation with the SUV occupants which was followed by a second encounter only 10 minutes later when the SUV returned. During the subsequent incident, the SUV came to a complete stop, and the passenger opened fire. One of the two persons shot just happened to be the young man who previously exchanged words with the passenger. The SUV then drove off slowly. This testimony depicts a deliberate and retaliatory shooting by the SUV occupants.

In contrast, the defendant asserted that he never completely stopped the SUV and "took off" after the shooting because he panicked. He initially claimed that someone in the group of teenagers fired at the SUV and that his nephew fired back in response. He then contended that he did not realize where the shots came from before finally admitting that his nephew, who was seated next to him, fired them. The defendant gave several inconsistent statements as to how Evans came back into possession of the gun, which the defendant admitted "taking away" from him the day before due to his "bad temper." Furthermore, by his own admission, the defendant fled the scene, did not stop to render aid to the wounded, and never called the police to report the shooting. See *State v. Meyers,* 95–750, 96–35, 96–395 (La.App. 5th Cir.11/26/96), 683 So.2d 1378, *writs denied,* 97–0015 (La.5/9/97), 693 So.2d 766, 98–2530 (La.2/5/99), 737 So.2d 745, 2000–0995 (La.12/8/00), 775 So.2d 1079. In the defendant's versions of the offense, he sought out the teens who were involved in the prior incident as part of a noble—but failed—lesson in conflict resolution, and it was merely a tragic coincidence that Evans regained access to the gun in close proximity to the time of the shooting and that one of the two people shot was the young man who angered Evans.

Faced with these two wildly divergent accounts of the fatal shooting, the jury was required to make credibility determinations. It obviously resolved them against the defendant, whose three accounts of the incident contained numerous inconsistencies. Such credibility evaluations are within the province of the trier of fact. Even if we totally discount Evans' statements, which are discussed in detail *infra,* the other evidence presented at trial is sufficient to conclude that the defendant was a principal to a deliberate and retaliatory drive-by shooting which was aimed at the young man who was wounded, but which also resulted in the senseless death of Ms. Wiley.

*Id.* at 437.

Here, Petitioner argues that his own statements to the police, in conjunction with Evans' January 2008 letter to the police, "conclusively establish[]" that Mason did not know Evans was going to fire the gun. [doc. #1-2, p. 15]. But as the appellate court pointed out, the statements given by Mason and Evans were wildly different from the statements given by four witnesses to the incident, and Mason's own statements contained many inconsistencies. He was the driver of

the vehicle and there was evidence that he, at a minimum, informed Evans of where the gun was located. A district court, on *habeas* review, is not to second-guess the credibility determinations made by a jury. *See Schlup v. Delo*, 513 U.S. 298, 340 (1995) (noting that the *Jackson* standard "requires a solely retrospective analysis of the evidence considered by the jury and reflects a healthy respect for the trier of fact's 'responsibility . . . to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inference from basic facts to ultimate facts.'") (citing *Jackson*, 443 U.S. at 319)); *U.S. v. Ramos-Garcia*, 184 F.3d 463, 465 (5th Cir. 1999) (under *Jackson*, courts "must view the evidence in the light most favorable to the jury's verdict without second-guessing the weight or credibility given the evidence by the jury."). A review of the state court record shows that the state court's findings were entirely reasonable; thus, the undersigned cannot say that the state court's application of *Jackson* was objectively unreasonable.

Petitioner's claim for relief based on insufficient evidence should be **DENIED**.

2.    Denied His Right to Confrontation

Petitioner contends that he was denied his constitutional right to confront Charles Evans at trial. [doc. #1-2, p. 16].

At Mason's trial, Evans invoked his Fifth Amendment right against self-incrimination and did not testify. In January 2008, Evans wrote a letter in which he asked that all charges against Mason be dropped because Mason did not know a shooting was going to occur. Mason introduced this letter into evidence at trial. In response, the State introduced two prior statements made by Evans to police as impeachment evidence of the January 2008 letter. In these prior statements, Evans recounted, among other things, Mason giving him the gun and telling Evans to use it if he needed to. *See Mason*, 109 So.3d at 438. Mason asserts that the State impermissibly

argued the *substantive* nature of Evans' prior statements, as opposed to using them for *impeachment* purposes only, denying Mason his right to confrontation. [doc. #1-2, p. 17]. He complains that the State told the jury in closing arguments that Evans' prior statements were the "ringing evidence" in the case.

On appeal from his conviction, the appellate court found that Evans' statements were admissible at trial under Louisiana Code of Evidence article 806 to attack the credibility of the 2008 letter. *Mason*, 109 So.3d at 439. The appellate court also declined to review Mason's confrontation claim under Louisiana Code of Criminal Procedure article 841, which precluded Mason from complaining about the state's closing argument or the jury instructions on appeal because he never objected to either at trial. *Id.*

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and is adequate to support that judgment. *See Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or *habeas* review. *Amos v. Scott*, 61 F.3d 333, 388 (5th Cir. 1995). Procedural default does not bar federal court review of a federal claim raised in a *habeas* petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is "independent" of federal law and rests on a state procedural bar. *Glover*, 128 F.3d at 902. A state court expressly bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989). Similarly, to be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases. *Id.*

A petitioner, however, may be excepted from the procedural default rule if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Glover*, 128 F.3d at 902. To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The mere fact that the petitioner failed to recognize the factual or legal basis for a claim, or failed to raise the claim or objection despite recognizing it, does not constitute cause for a procedural default. *Id.* at 486.

Here, as mentioned, the appellate court relied on Louisiana Code of Criminal Procedure article 841 in denying review of  Mason's confrontation claim. The Louisiana Supreme Court denied Mason's writ of certiorari without opinion. "Where the last reasoned state court opinion on a federal claim explicitly imposes a procedural default, there is a presumption that a later decision rejecting the same claim without opinion did not disregard the procedural bar and consider the merits." *Lott v. Hargett*, 80 F.3d 161, 164 (5th Cir. 1996) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

Article 841 provides, in pertinent part,

A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

LA. C. CR. P. art. 841.

It is well-settled that the contemporaneous objection rule codified by article 841 is an independent and adequate state procedural ground which bars federal habeas corpus review.

*Favors v. Cain*, No. 130491, 2015 WL 349263, *31 (E.D. La. Jan. 22, 2015) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977)); *Duncan v. Cain*, 278 F.3d 527, 541-42 (5th Cir. 2002). Petitioner has not offered any cause for the default that would excuse the procedural bars imposed by the appellate court. Nor does this Court's review of the record reveal any factor external to the defense that prevented Petitioner from properly objecting. "The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997). Having failed to show an objective cause for his default, the Court does not need to determine whether prejudice existed.

Petitioner's claim is thus procedurally barred from review absent a showing that a fundamental miscarriage of justice will occur if the merits of the claim are not reviewed. *Id.* To establish a fundamental miscarriage of justice, Petitioner must provide this Court with evidence that would support a "colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986). To satisfy the factual innocence standard, Petitioner must show that "but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997).

Petitioner makes no argument that a fundamental miscarriage of justice will occur if his claims are not reviewed by this Court or that suggests his actual innocence on the underlying conviction. Accordingly, Petitioner has failed to overcome the procedural bar to his post conviction claim.

Petitioner's claim should be **DENIED.**

3.  <u>Jury Was Permitted to Render a Verdict Without Requiring the State to Meet its Burden of Proof on the Requisite Intent</u>

14

Petitioner argues that the "State's arguments and the trial court's jury instructions on the law of principals may have improperly allowed the jury to find James Mason guilty of second degree murder without the requisite proof of specific intent and on the basis of 'impeachment evidence' alone." [doc. #1-2, p. 18].

The State argues, and the Court agrees, that this claim is unexhausted because Mason never alerted the state courts to the federal nature of this claim. [doc. #21-1, p. 20]. A state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). A claim is deemed exhausted if the prisoner "fairly presents" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *Id.* at 29-32. Mason raised this claim on direct appeal to the Second Circuit Court of Appeal. However, as in the instant petition, Petitioner failed to reference any federal source of law in his state court appeal. *See Baldwin*, 541 U.S. at 32-33 (habeas petitioner did not "fairly present" a claim where petition did not cite to the federal constitution, or any cases that might have alerted the state court to the federal nature of the claim).

Even if Petitioner had exhausted this claim, federal habeas review would still be barred because the appellate court declined to review Petitioner's claim on independent and adequate state grounds. The appellate court declined to review this claim under Louisiana Code of Criminal Procedure article 841 because Mason did not object to any portion of the state's closing argument or to the proposed jury instructions. *Mason*, 109 So.3d at 439. As discussed *supra*, the contemporaneous objection rule codified by article 841 is an independent and adequate state procedural ground which bars federal habeas corpus review. *Favors*, 2015 WL 349263, at *31 (citing *Wainwright*, 433 U.S. at 87-88); *Duncan*, 278 F.3d at 541-42. Furthermore, as discussed

above, Petitioner has not offered any cause for the default that would excuse the procedural bars imposed by the appellate court, and he makes no argument that a fundamental miscarriage of justice will occur if his claims are not reviewed by this Court.

Petitioner's claim should be **DENIED**.

4.    The Trial Court Erred in Denying Petitioner's *Batson* Challenges

Petitioner argues that the trial court erred in finding that he failed to establish a prima facie case of purposeful discrimination in the jury selection and in denying his *Batson* challenge. [doc. #1-2, p. 21]. Mason argues that the trial court erred in failing to make the State provide a race-neutral reason for four prospective African-American jurors: Mandel Davis, Marcus Clark, Joyce Mcgaskey, and Herbert Lee Dotson.

A party's racially discriminatory use of peremptory challenges violates the Equal Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *Georgia v. McCollum*, 505 U.S. 42, 46 (1992). Trial courts use a three-step analysis in evaluating a defendant's claim that the State exercised peremptory challenges on the basis of race. *Batson*, 476 U.S. at 96-98.  First, "a defendant must make a *prima facie* showing that the prosecutor exercised his peremptory challenges on the basis of race." *Id.* at 96.  "Once the defendant makes a *prima facie* showing, the burden shifts to the State to come forward with a [race] neutral explanation . . . ." *Id.* at 97.  The "trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98.

To establish a prima facie case, the objecting party: "(1) must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove members of that group from the venire; (2) is entitled to rely on the fact 'that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a

mind to discriminate'; and (3) must show that these facts and circumstances raise an inference that the prosecutor exercised peremptory challenges on the basis of race." *Price v. Cain*, 560 F.3d 284, 286 (5th Cir. 2009) (citing *Batson*, 476 U.S. at 96)).

The objecting party makes a prima facie case by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. The objecting party does not have to show that "more likely than not" the peremptory challenge was based on impermissible group bias. *Johnson v. California*, 545 U.S. 162, 171-72 (2005). The burden upon the objecting party is therefore a "light burden," for purposes of establishing a prima facie case. *Price*, 560 F.3d at 287.

A reviewing court should give a trial judge's factual findings on discriminatory intent great deference and should not reverse them unless they are clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 364-65 (1991). The presumption of validity attaching "to a trial court's factual finding at *Batson*'s third step . . . is doubly strong when the *Batson* finding is under collateral attack in habeas." *Miller–El v. Dretke*, 545 U.S. 231, 284 (2005).

In this case, the State exercised eleven peremptory challenges on African-American jurors and one on a white juror. The defense peremptorily challenged eleven white jurors and one African-American juror. At the conclusion of jury selection, and after the defense and the State made *Batson* and reverse-*Batson* challenges, the trial court concluded that the defense failed to make a prime facie showing based on the fact that the jury was comprised of seven African-American jurors. [doc. #21-3, p. 189]. It also denied the State's reverse-*Batson* challenge. Both parties sought supervisory review with the Louisiana Supreme Court, which sustained the State's reverse-*Batson* challenge and remanded the matter for reseating of two Caucasian prospective jurors. *See State v. Mason*, 68 So.3d 513 (2011).

17

On appeal, the appellate court found that the trial court did not err in denying the defendant's *Batson* challenge in light of the fact that the majority of jurors were African-American. [doc. #1-3, p. 22]. It further concluded that the voir dire proceedings did not reveal any inference of racial discrimination on the part of the state during voir dire. *Id.* It stated, "although the state was not required to provide race-neutral reasons for its challenges, the record discloses race-neutral reasons for a majority of the jurors struck by the state, including the ones cited by the defendant in his brief." *Id.* at 22-23. It further stated,

> Mandel Davis was the victim of a burglary who was dissatisfied with the state's handling of the case; he also had a relative who was serving time in prison for a drug charge. Marcus Clark had a family member who was incarcerated for carrying a firearm as a convicted felon. Joyce Mcgaskey stated during voir dire that she was concerned that she had been told at work that she would not be paid while she was serving as a juror and she had concerns about paying her rent. Herbert Lee Dotson exhibited some confusion about the burden of proof. This assignment of error is meritless.

*Id.* at 23.

Based on a review of the voir dire proceedings, the undersigned cannot conclude that the state court unreasonably applied *Batson* or based its decision on an unreasonable determination of the facts in light of the evidence presented. To establish a prima facie case, Mason relies solely on the fact that the prosecution struck eleven potential African-American jurors. Without more, this is insufficient to grant relief as to the state court's determination that no prima facie case was made. *See Rivers v. Thaler*, 389 Fed. App'x 360, 363 (5th Cir. 2010); *Medellin v. Dretke*, 371 F.3d 270, 278-79 (5th Cir. 2004) (rejecting the argument that using six of thirteen peremptory strikes to excuse minorities presented "statistical evidence of discrimination" because the "number of strikes used to excuse minority . . . pool members is irrelevant on its own"). The touchstone of *Batson's* first step is the "inference that discrimination has occurred."

*Johnson*, 545 U.S. at 170. Moreover, it was not unreasonable for the state court to conclude that Mason failed to meet step one of *Batson* when the jury was majority African-American. *See, e.g., Miller-El*, 545 U.S. at 240-41 (circumstantial indication of intentional racial discrimination where, out of twenty potential African-American jurors, the prosecution used peremptory strikes on ten, and excused nine others for cause or by agreement); *Price*, 560 F.3d at 286 (*Batson* first step satisfied where prosecution's use of peremptory challenges to strike six African-American veniremen resulted in an all-white jury).

Furthermore, even if the state court erred by not moving to *Batson's* second step, reversal of Mason's conviction is not automatic. *See Johnson*, 545 U.S. at 171 n. 6. Assuming the trial court erred in finding that Mason failed to meet *Batson's* first step, and that the prosecution erred by not formally completing the second, Mason must still prove purposeful discrimination under *Batson's* third step. As the appellate court reasoned, two factors strongly cut against Mason's claim for habeas relief. First, the voir dire record is well developed with regard to reasons for which the four stricken jurors would not be favorable to the prosecution. Cross-examination elicited race-neutral reasons before the trial court. [doc. #21-5, pp. 37-38 (Mandel Davis); pp. 41-42 (Marcus Clark); pp. 56-58 (Herbert Lee Dotson); pp. 204-05, 217-218 (Joyce McGaskey)]. Second, the initial jury (before the Louisiana Supreme Court reseated two white jurors, but after the *Batson* and reverse-*Batson* challenges were made) was composed of majority African-American members.

Petitioner's *Batson* claim should be **DENIED.**

5.    Ineffective Assistance of Counsel Claims

Claims 5, 6 and 7 assert that Petitioner's trial and appellate counsel provided ineffective assistance. Substandard advice of counsel rises to a constitutional violation only if the

substandard conduct deprives the petitioner of his constitutional right to a fair trial or deprives the petitioner of some other constitutional right. *Strickland v. Washington.*, 466 U.S. 668, 686-87 (1984). To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the ineffectiveness of counsel prejudiced him. *Id.*

If the petitioner does not make a sufficient showing as to one prong of the test, the other prong need not be considered. *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997). The prongs of the test also need not be analyzed in any particular order. *Goodwin v. Johnson*, 132 F.3d 162, 172 n.6 (5th Cir. 1997). Furthermore, "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." *Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

In applying the first prong of *Strickland*, a court should presume that the attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy. *See Strickland*, 466 U.S. at 689-90. The petitioner must show that the performance of counsel fell "outside the wide range of professionally competent assistance." *Id.* at 690; *Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994).

Under the second prong, "the petitioner must show that, as a result of counsel's errors, his trial was rendered unfair or unreliable, i.e., petitioner must show 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Brown v. Dretke*, 419 F.3d 365, 374 (5th Cir. 2005) (citing *Williams v. Taylor*, 529 U.S. 362, 391 (2000)).

A *habeas* court's scrutiny is "doubly deferential" in a review of a state court's *Strickland* determination. *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013). "When § 2254(d) applies,

the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* (citing *Harrington*, 131 S.Ct. at 788).

On August 6, 2014, the trial court denied post-conviction relief as to all three claims, concluding that Mason failed to meet his burden under *Strickland*. [doc. #1-5, p. 12-13]. On December 10, 2014, the appellate court denied writ "[u]pon the showing made". *Id.* at 47. Ultimately, the Louisiana Supreme Court denied writ on November 6, 2015, holding that Mason "failed to show he received ineffective assistance of counsel". *Id.* at 71.

### A. Trial Counsel's Failure to Object When the State Read the Entirety of Charles Evans' Statements at Trial

Petitioner asserts that he received ineffective assistance of trial counsel because trial counsel failed to object to the State's playing of the entirety of Charles Evans' statements to the police at trial. [doc. #1-2, p. 28].

At trial, Mason introduced a letter written by Evans that stated Mason did not know a shooting was going to occur. The State therefore introduced prior inconsistent statements made by Evans to the police for purposes of impeaching the letter. According to Mason, trial counsel allowed the State to play the entirety of Evans' prior statements, instead of a redacted version containing only relevant portions. Mason further complains that trial counsel failed to object to inflammatory remarks and references to the inadmissible portions of Evans' statements made by the prosecutor in closing arguments. *Id.* at 28-29.

The trial court concluded that Mason failed to make any showing that the non-relevant portions of Evans' statements had any undue influence on the jury's verdict. [doc. #1-5, p. 13].

The court finds that Mason has not established that defense counsel's actions were

deficient. As Petitioner concedes, his counsel repeatedly objected to the State's introduction of Evans' statements. [doc. #21-3, pp. 325-27, 330; #21-8, pp. 152-53]. When the trial court admitted the statements, trial counsel sought pre-trial review of the admissibility of Evans' statements from the Second Circuit Court of Appeal. *Id.* at 294-301. The appellate court found that the trial court correctly determined Evans' statements were admissible hearsay under Louisiana Code of Evidence article 806. [doc. #1-4, p. 17]. Presumably, counsel did not make a contemporaneous objection during trial because he was aware that such an objection would be frivolous in light of the trial court's ruling, and the appellate court's affirming same. Furthermore, trial counsel objected to the admission of the entirety of Evans' statements, as well as the State's reference to same in its closing argument, at the hearing on the motion for a new trial. *See* doc. #21-10, p. 348-53. He argued that Mason was "robbed" of his right to confront Evans. *Id.* at 349. The trial court, again, rejected these arguments in light of the issue already being litigated at trial and on pre-trial review. *Id.* at 350-51.

Additionally, this court is highly deferential to trial counsel's strategical choices. *See U.S. v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002). Evans' prior inconsistent statements were only admitted as impeachment evidence in response to the defense's motion to admit Evans' 2008 letter that exonerated Mason. This letter was a key piece of evidence for Petitioner's defense. As the State points out, "To draw attention to this contradiction [during closing argument] would undermine the most persuasive piece of evidence the defense had in its possession." [doc. #21-1, p. 31].

Even if Mason could demonstrate deficient performance on counsel's behalf, he fails to show that Evans' statements prejudiced the outcome of the trial. Evans' statements aside, there was ample evidence in this case to support the jury's conviction of second degree murder,

namely the eye witness testimony of four individuals, the fact that Mason was driving the vehicle and opted to return after the initial altercation with the victims, and his own prior statement that he, at a minimum, informed Evans of where the gun was located. [doc. #21-10, pp. 368-69]. Moreover, Mason drove off after the shooting, failing to stop and aid the victims or call 911. *Id.*

Petitioner's claim for ineffective assistance of counsel on this basis should be **DENIED**.

*B. Trial and Appellate Counsel Failed to Raise Issue of Impeached Testimony Being Impermissibly Used to Convict*

Similar to the previous claim, Petitioner argues that trial and appellate counsel provided ineffective assistance for failing to raise the issue of impeached testimony being impermissibly used to convict Mason. Mason complains that "impeachment works both ways." [doc. #1-2, p. 32]. He avers that the "State wished to show Mr. Evans as a liar, but then wanted the jury to believe his [prior inconsistent] statement to the police. A liar cannot be believed on the one hand, but not the other." *Id.* He contends that impeached testimony cannot stand alone to convict. *Id.* Trial counsel did not argue these issues at the motion for a new trial hearing, and appellate counsel did not argue them on appeal. *Id.*

To reiterate, Mason's co-defendant, Evans, provided a written statement to police that essentially exonerated Mason. That letter was contradicted by Evans' initial statements to police. Mason also gave various statements to the police that contained several inconsistencies. On post-conviction relief, the trial court ruled that "Petitioner fail[ed] to prove that any oral argument or briefing on this issue by trial and appellate counsel would have convinced the trial and appellate courts that Evans' letter was more credible than his two prior, consistent statements to authorities." [doc. #1-5, p. 13].

Here, Mason has failed to demonstrate that his trial counsel was deficient. As discussed

in the previous section, trial counsel objected to the State's introduction of Evans' statements. During closing arguments, defense counsel argued to the jury that Evans' statement exonerating Mason was reliable. [doc. #21-9, pp. 81-82, 87-89]. Moreover, at the motion for a new trial hearing, defense counsel called Evans to the stand and examined him regarding his written statement that Mason had nothing to do with the shooting. [doc. #21-10, pp. 322-28]. He also elicited testimony from Evans that Mason did not give him the gun or encourage him to use it. *Id.* at 323-24. It is evident that trial counsel made a valiant effort to convince the court and the jury that Evans was a credible witness and that his prior statements exonerating Mason were truthful. The fact that defense counsel's efforts were unsuccessful does not render his assistance ineffective. The jury apparently discredited Evans' written statement, and believed Mason was guilty of second degree murder. A federal habeas court may not substitute its own credibility determinations for those of the state court even if it disagrees with the state court's findings. *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005).

Furthermore, as discussed in the previous section, even if Mason could show that his trial counsel's performance was deficient, he cannot establish prejudice because there was ample evidence, even without Evans' statements, to convict Mason of second degree murder.

Petitioner's claim for ineffective assistance of counsel on this basis should be **DENIED**.

*C. Trial Counsel's Failure to Object to the Jury Instructions and Closing Arguments and Appellate Counsel's Failure to Raise Ineffective Assistance of Trial Counsel on Appeal*

Petitioner asserts various arguments in support of his last claim for ineffective assistance of counsel. First, Petitioner contends that his trial counsel was ineffective for failing to object to the jury instructions at trial. [doc. #1-2, p. 33]. He alleges that the instructions "improperly allowed the jury to convict" him of second degree murder "without the requisite proof of specific

24

intent, and on the basis of 'impeachment evidence' alone." *Id.* Second, he complains that the jury was not instructed "that Charles Evans' statement(s), which were introduced as impeachment evidence, were not competent evidence from which the jury could find the requisite intent to find guilt." *Id.* Third, Mason argues that trial counsel was ineffective for failing to object during the State's closing arguments. [doc. #1-2, p. 34]. He contends that the State's argument impermissibly expanded the definition of a principal in a drive-by shooting. *Id.* Lastly, he argues that appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel on appeal for trial counsel's errors.

On post-conviction relief, the trial court ruled that "the jurors were adequately instructed on the laws governing principals and the requisite intent necessary for a second-degree murder conviction." [doc. #1-5, p 13]. It further held that "Petitioner fail[ed] to prove that he suffered any prejudice from any alleged deficient performance by defense counsel at either the trial or appellate levels." *Id.*

To establish ineffective assistance based on trial counsel's failure to object to a jury instruction, a state prisoner must demonstrate not just that the alleged jury instruction was in error, and not just that his lawyer's failure to object to it was in error, but that such a failure was so serious as to fall below an objective standard of reasonableness and thereby prejudice the defense. *Thacker v. Dretke*, 396 F.3d 607, 614 (5th Cir. 2005). Mason has failed to meet this standard.

To start, Mason has failed to show that the jury instructions were erroneous. The jury was instructed on the elements of principals and second degree murder, and explicitly told that "[s]econd-degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm, or when the offender is engaged in the perpetration or

attempted perpetration of assault by driveby shooting even though he has no intent to kill or to inflict great bodily harm." [doc. #21-9, pp. 143-44]. This instruction is entirely consistent with Louisiana law, and trial counsel had no basis to object. *See* LA. R.S. § 14:37.1(A), (C).

Next, Mason complains that his trial counsel was ineffective for failing to request a limiting instruction clarifying that Evans' statements were to be used for impeachment purposes only. [doc. #1-2, p. 33]. It does not appear that trial counsel requested a limiting instruction once Evans' prior inconsistent statements were admitted at trial. *See U.S. v. Hill*, 481 F.2d 929, 932 (5th Cir. 1973) ("It is the duty of the court, when so requested, to instruct the jury as to the limited purpose for which the impeaching evidence is admitted and advise the jury as to the extent to which the evidence may be considered."). Some courts have concluded that reasonably prudent counsel would have requested an instruction directing the jury to consider the contents of impeachment statements for impeachment purposes only once they had been read into the record in their entirety. *See Blanton v. Quarterman*, 489 F.Supp.2d 621, 676 (W.D. Tex. 2007). But even assuming Mason can show that his trial counsel was ineffective for failing to request a limiting instruction, Mason cannot establish prejudice because there was ample evidence, even without Evans' statements, to convict Mason of second degree murder. *See id.* at 677 (if impeachment evidence was "the full extent of the prosecution's case against petitioner," the failure of petitioner's trial counsel to request a limiting instruction might satisfy the prejudice prong).

However, the Fifth Circuit adheres to a rule that in certain circumstances, the failure to give such an instruction *sua sponte* by the court amounts to plain error. *U.S. v. Waldrip*, 981 F.2d 799, 805 (5th Cir. 1993); *U.S. v. Garcia*, 530 F.2d 650, 656 (5th Cir. 1976). "Plain error appears only when the impeaching testimony is extremely damaging, the need for the instruction is

obvious, and the failure to give it is so prejudicial as to affect the substantial rights of the accused." *Id.*

The trial court did not commit plain error in this case. In view of the other evidence against Mason—the eye witness testimony of four individuals, Mason was driving the vehicle, Mason opted to return after the initial altercation with the victims, his own prior statement that he, at a minimum, informed Evans of where the gun was located, and the fact that Mason drove off after the shooting, failing to stop and aid the victims or call 911—the impeachment evidence was not extremely damaging. *See Waldrip*, 981 F.2d at 805-06 (finding no plain error in view of other evidence against the petitioner).

Mason further asserts that statements made during the government's closing argument "impermissibly expanded the definition of a principle [sic] in a drive-by shooting situation to include anyone in the car when a shooting occurs except someone in the back seat who protests repeatedly not to go back."   [doc. #1-2, p. 34]. Trial counsel did not object during closing arguments. Specifically, the prosecution argued,

> That criminal instruction that he gave you as far as mere presence at the scene and knowledge that a crime is about to be committed as insufficient to convict. I hate, ladies and gentlemen, when the Legislature creates a law that's designed to protect truly innocent individuals in a situation and then it's exploited in a situation like this. Because that law applies to, and consider this in your deliberations, had there been a backseat passenger in their car, and the evidence showed that this backseat passenger is scared as can be. And they're like, we're going back to the scene to confront these guys. And we got a gun, and he says, I don't want to go back, I don't want to go back, I don't want to go back, I don't want to go back. They driveup, I don't want to go back. They drive up, I don't want to go back and then a shooting occurs. He's present, he knows about the crime, but he's not concerned in the commission. That's what the statute is for, ladies and gentlemen. Do not be mislead by the statute when you read it.

[doc. #1-2, p. 34].

The court finds that the prosecutor's statements were not improper, and thus required no

27

objection. Louisiana law provides that a defendant who is a principal in a drive-by shooting can be convicted of second degree felony murder even though the fatal shot was fired by a companion acting in concert with the defendant in the commission of the shooting. *State v. Stewart*, 982 So.2d 353 (La. Ct. App. 2d Cir. 2008). "All persons concerned in the commission of an offense, either directly or indirectly, are principals in the crime and culpable according to the mental state they possess at the time of the offense." *Mason*, 109 So.3d at 434. "Only those persons who knowingly participate in the planning or execution of a crime are principals." *Id.* "Mere presence at the scene is therefore not enough to 'concern' an individual in the crime." *Id.*

The prosecutor's arguments were not contrary to Louisiana law. The prosecutor did not, for example, argue that Mason could be convicted of second degree murder merely because he drove the car. The prosecutor did not argue that Mason could be convicted of second degree murder even if he did not participate in the planning or commission of the drive-by shooting. The State merely provided an example of a hypothetical defendant who should *not* be convicted of second degree murder. Thus, trial counsel was not required to object and his assistance was not deficient in this regard. Even assuming the State's comments were improper, failing to object was not so prejudicial as to undermine confidence in the reliability of the verdict.

Since Mason did not pass the *Strickland* test with respect to his trial counsel's performance, his complaint against his appellate counsel warrants no relief. *See Moawad v. Anderson*, 143 F.3d 942, 948-49 (5th Cir. 1998).

Petitioner's claims for ineffective assistance of counsel on these grounds should be **DENIED**.

### Conclusion

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for writ of

28

*habeas corpus* filed by Petitioner James E. Mason, Jr., [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  *See* 28 U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

29

In Chambers, Monroe, Louisiana, this 1st day of March, 2017.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE